## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | |
|---|---|
| MICHELLE D. BRADY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )      No. 4:13CV2076 RLW |
| | ) |
| CAROLYN W. COLVIN, | ) |
| Acting Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM AND ORDER

This is an action under 42 U.S.C. §§ 405(g) and 1383(c)(3) for judicial review of

Defendant's final decision denying Plaintiff's applications for Disability Insurance Benefits

("DIB") under Title II of the Social Security Act and for Supplemental Security Income ("SSI")

under Title XVI of the Act. For the reasons set forth below, the Court reverses the decision of

the Commissioner and remands for further proceedings.

## I. Procedural History

On June 14, 2011, Plaintiff protectively filed applications for DIB and SSI alleging

disability beginning November 10, 2010 due to swelling of left foot, ankle, and leg. (Tr. 102,

154-63) The applications were denied, and Plaintiff filed a request for a hearing before an

Administrative Law Judge ("ALJ"). (Tr. 100-06, 112) On April 5, 2012, Plaintiff testified

before an ALJ. (Tr. 75-99) On November 16, 2012, the ALJ determined that Plaintiff had not

been under a disability from November 10, 2010, through the date of the decision. (Tr. 79-90)

Plaintiff then filed a request for review, and on August 12, 2013, the Appeals Council denied

said request. (Tr. 1-4) Thus, the decision of the ALJ stands as the final decision of the

Commissioner.

## II. Evidence Before the ALJ

At the April 5, 2012 hearing before the ALJ, Plaintiff was represented by counsel. Plaintiff's attorney first informed the ALJ that Plaintiff was recently hospitalized at St. Anthony's Hospital, and she had a sleep apnea study scheduled at Washington University. The ALJ agreed to leave the record open for 60 days to submit additional records. (Tr. 77-79)

Counsel then presented an opening statement, indicating that Plaintiff was recently placed on diabetic medications. She noted, however, that the case primarily pertained to Plaintiff's ankle and that Plaintiff's doctor recently indicated that she may need another surgery on her ankle. Although Plaintiff had not been treated for depression, counsel believed that a psychiatric consulting examination was appropriate. (Tr. 80)

The ALJ then questioned the Plaintiff, who testified that she was born on August 26, 1970. She was 5 feet tall and weighed 245 pounds. Plaintiff had lost 27 pounds after her pregnancy. Plaintiff was single and had two children ages 15 and 5 ½ months. Plaintiff lived in Section 8 housing with her children and her mother. She had a 12th grade education and did not attend college or receive vocational training. Plaintiff ceased working in November 2010, although she attempted to return to work for Metro in May 2011. Her doctor took her off work due to medical complications and her pregnancy. She had not filed for unemployment benefits or worker's compensation. Plaintiff and her youngest child received Medicaid. She also received child support for the older child. Plaintiff's past relevant work included driving a bus for student management and babysitting. She denied any problems with alcohol, illicit drug use, or police. (Tr. 81-84)

Plaintiff's attorney also questioned her regarding her ankle problems, which she stated began in 2005. She fell down some stairs and broke her ankle in two places. One and one half

2

years after the injury, her feet and ankle started swelling. Doctors told her that arthritis had set into her ankle, and one doctor diagnosed plantar fasciitis. Although the doctor recommended exercises, Plaintiff was convinced something else was wrong. Her leg then started swelling and becoming numb. Plaintiff testified that a different clinic ran a test that showed abnormal blood flow in her left leg. Because her insurance was limited, Plaintiff was unable to follow up. Two years later, she found a foot doctor who put her in a boot. She informed the doctor that she was unable to drive the Metro bus wearing the boot, but the doctor told her she needed to keep the boot on. When Plaintiff informed Metro about the boot, they told her she could not work while wearing the boot, and they placed her on leave. Plaintiff further stated that, after her doctor received the MRI results, he referred her to a specialist for surgery. Dr. Harry Visser assessed five chronic torn ligaments which caused severe swelling. Dr. Visser performed surgery on December 2, 2010. Plaintiff wore a cast for 2 ½ weeks then attended physical therapy. However, her ankle continued to swell. (Tr. 85-90)

She returned to work at Metro in May 2011 but was only able to work for three or four weeks due to continuing problems with swelling in her ankle and with her pregnancy. Dr Visser and her OB/GYN advised Plaintiff to stop working until she delivered the baby. However, Plaintiff testified that she continued to have problems with her ankle swelling. Therapy and cortisone shots did not help. Plaintiff stated that Dr. Visser wanted to clean out the ankle but also indicated that she could have irreparable nerve damage. She last saw Dr. Visser in February 2012 for a cortisone shot. He prescribed water pills to try to decrease the swelling until he could perform surgery. Plaintiff stated that Dr. Visser was certain that she had nerve damage in her ankle because he could not understand the continued swelling. The ALJ noted that Dr. Visser

3

assessed a stable ankle with some edema. Plaintiff explained that her ankle was stable but still swelling and that Dr. Visser wanted to perform surgery. (Tr. 90-91, 97-98)

Plaintiff also testified that she was recently hospitalized after her tongue swelled and she was unable to breathe. The physicians gave her steroids, which Plaintiff believed caused her diabetes. However, Plaintiff had not been diagnosed with diabetes and planned to see a specialist. With regard to her sleep apnea, Plaintiff stated that she planned to see someone for a sleep study. Her doctor indicated a possibility that sleep apnea caused a heart valve to not close all the way. Plaintiff further stated that she felt depressed after losing her job at Metro and after 5 years of misdiagnoses. She believed that she would not be suffering if the doctors would have properly diagnosed her ankle problem earlier. (Tr. 91-93)

Plaintiff stated that she had to resign from Metro in December of 2011. Her mother lived with her and helped with the house and the baby. Plaintiff was able to perform limited housework. She could prepare her baby's bottles, but her mother did the laundry because the washer and dryer were downstairs, and her ankle swelled after using the stairs. Plaintiff stated that she could only stand for about 2 hours before her ankle swelled and she needed to elevate it. She could drive but not for long periods of time because the swelling caused numbness. Plaintiff specified that she could drive for 2 or 3 hours before needing to stop and elevate her ankle. Plaintiff's mother did the cooking and grocery shopping. Sometimes Plaintiff shopped, but she rode in the wheelchair cart. Plaintiff stated that she had trouble getting to sleep, and then she only slept about 3 hours. She did not visit friends but was able to leave the house for doctor's appointments. She went out to eat with her oldest child once a month. Plaintiff opined that she could sit 2 or 3 hours before her ankle swelled. She needed to elevate her ankle to reduce the

4

swelling. She had difficulty getting in and out of the tub because she was unable to lift her leg when her ankle was swollen. (Tr. 93-96)

On August 22, 2012, Brenda Young, a vocational expert ("VE") completed a Vocational Interrogatory. She noted that Plaintiff had past work experience as a home health aide, which was medium, semi-skilled work, and a bus driver, which was also medium, semi-skilled work. The VE assumed a hypothetical individual like Plaintiff who was limited to sedentary work with an inability to climb ladders, ropes, or scaffolds; kneel; crouch; or crawl. The person could occasionally climb ramps or stairs, as well as stoop. She could not operate foot controls and needed to avoid concentrated exposure to extreme vibration and all exposure to operational control of moving machinery, working at unprotected heights, and using hazardous machinery. The individual required work with simple, routine, and repetitive tasks in a low stress job, with only occasional decision making and changes in the work setting. Further, she could have no interaction with the public and only casual and infrequent contact with co-workers. In light of this hypothetical, the VE stated that the individual could not perform any of Plaintiff's past jobs. However, she could perform jobs existing in the local and national economies, including small product assembler. This job was listed in the Dictionary of Occupational Titles as "light," but a small number are performed at the sedentary level. (Tr. 239-42)

## III. Medical Evidence

On January 26, 2010, Plaintiff saw Dr. Felicia Brown for complaints of pain and swelling in her left ankle post-fracture. Her left ankle was tender to palpation, but Dr. Brown observed no swelling. (Tr. 328-29) Left ankle x-rays taken on February 2, 2010 showed no fracture or dislocation, but a calcaneal spur was present. (Tr. 332)

5

Darnetta Carter, LCSW, met with Plaintiff on February 25, 2010 for complaints of depression and anger because she was unable to retain her job as bus driver due to chronic pain and swelling in her ankle. Plaintiff reported angry outbursts, irritability, difficulty sleeping, nervousness, and mood swings. Her relationship with her teenage daughter had become strained due to her symptoms. Ms. Carter referred Plaintiff to psychiatry. (Tr. 323)

That same date, Plaintiff saw William Feldner, D.O., due to her previous left ankle injury that resurfaced with pain and swelling radiating up her leg and hip. Examination revealed was obesity, normal gait, and normal exam of left foot and ankle. X-ray findings were minimal, and Dr. Feldner opined that Plaintiff needed ankle rehabilitation and weight loss to fix her problem. (Tr. 325-26)

Plaintiff returned to Dr. Brown on March 1, 2010 for complaints of ankle pain. Dr. Brown noted that Plaintiff had gained weight. She also complained of feeling anxious and depressed. Examination of her left ankle was essentially normal. Dr. Brown prescribed Celexa for depressive disorder and referred her to radiology. (Tr. 321) Dr. Brown examined Plaintiff on March 22, 2010 to follow up on her depression and medications. Plaintiff had no new complaints or problems. She complained of being anxious and depressed but was in no acute distress. Plaintiff had a scheduled psychiatric appointment and reported no improvement with Celexa. Exam of the ankle was normal. Dr. Brown increased the Celexa dose and told Plaintiff to follow up in four weeks. (Tr. 316-17)

The following day, Plaintiff was examined by Dr. Mitul B. Shah for complaints of lower abdominal pain. Dr. Shah assessed ovarian cysts as shown on a previous ultrasound. The exit nurse counseled Plaintiff on healthy practices and scheduled a pelvic ultrasound in May. In addition, the nurse recommended pelvic floor therapy. (Tr. 314-15)

6

Ankle brachial radial arterial segmental Doppler studies performed on April 26, 2010 revealed a normal arterial flow on the right leg and mild arterial obstruction of the left leg. Myung Kang, M.D., noted possible vascular anomaly. (Tr. 330)

On April 30, 2010, Karen T. Nichols, FNP-C, examined Plaintiff for complaints of vaginal discharge. Plaintiff also complained of depression and frequent crying. Examination was essentially normal. Nurse Nichols assessed a urinary tract infection and referred to social service for her depressive disorder. Nurse Nichols noted that Plaintiff was not suicidal but indicated she would not fight if someone tried to kill her. (Tr. 305-06) That same date, Plaintiff met with Robin Hinshaw, MSW, LCSW. Ms. Hinshaw noted that Plaintiff missed her initial and follow-up psychiatry appointments. Plaintiff indicated that she had too much on her mind to remember to keep appointments. During the assessment, Plaintiff cried a lot and talked about abuse. Although she was emotional and upset, Plaintiff had not followed through on finding the help that could be of use. Ms. Hinshaw advised Plaintiff to keep all follow-up visits. (Tr. 304)

Plaintiff presented to the ER on May 10, 2010, complaining of chest pain radiating to her leg. She rated the pain 8/10. Plaintiff was given morphine for pain. An EKG, chest x-ray, and CTA of the chest were negative. Plaintiff's chest pain and leg pain resolved, and she was discharged with diagnoses of chest pain and myalgia of the left leg. (Tr. 563-68)

Plaintiff underwent an MRI of the left foot on November 11, 2010, which revealed a chronic partial tear of the right anterior talofibular ligament (ATFL). (Tr. 273) On November 19, 2010, Dr. Visser examined Plaintiff for complaints of left ankle pain. Dr. Visser assessed chronic left ankle instability and subchondral bruising. (Tr. 274)

On December 2, 2010, Dr. Visser performed modified Evans ankle stabilization, Brostrum primary repair of the ATFL, and injection of the plantar fascia on Plaintiff's left

foot. Postoperative diagnoses were chronic ankle instability of the left foot with rupture of the ATFL and plantar fasciitis of the left foot. Plaintiff was discharged with prescriptions for pain medications. Dr. Visser advised Plaintiff to return in two weeks. (Tr. 271)

Plaintiff returned to Dr. Visser on December 17, 2010. Dr. Visser cleaned and debrided the wound, which was healing nicely. Plaintiff reported no complaints. Dr. Visser noted normal post-op erythema and edema. Dr. Visser ordered a short leg immobilizer boot and advised Plaintiff to return in two weeks. (Tr. 269) On January 7, 2011, Dr. Visser noted that Plaintiff was doing relatively well 5 weeks post-op. She was using a walker and was not yet fully weight-bearing. Plaintiff reported that her ankle was painful and sore, but otherwise she was doing extremely well. Dr. Visser noted minimal edema. He prescribed Prednisone and ordered physical therapy. (Tr. 267) During her next visit on January 21, 2011, Plaintiff reported doing better, but she continued to have swelling and pain. Prednisone had not been effective in reducing her discomfort. Dr. Visser noted good stability of the subtalar joint, with soreness in the area of the sinus tarsi and residual edema. Dr. Visser also noted numbness along the course of the sural nerve. He administered a steroid injection and advised her to stay in the boot and then try physical therapy. (Tr. 266)

Dr. Visser examined Plaintiff again on February 11, 2011. Her progress was very slow, which Dr. Visser opined could be due to her heavy weight and long-standing condition. He noted that Plaintiff's edema was markedly reduced. However, Plaintiff reported that she experienced ankle swelling at the end of the day. Dr. Visser noted that he ankle was stable with a well-healing incision and intact range of motion. He indicated that her ankle could take up to a year to get to 100%. Dr. Visser sent Plaintiff to active physical therapy. (Tr. 265)

8

On March 11, 2011, Plaintiff saw Dr. Visser for a three month post-op examination. Her progress had been slow, and she was discouraged because she continued to have pain. She reported that physical therapy had not been helpful. Dr. Visser noted some swelling in both ankles. Her ankle was stable to inversion stress. Dr. Visser opined Plaintiff's weight contributed to her slow recovery, and she likely had some residual persistent capsulitis and inflammation that existed before the surgery. Dr. Visser administered a trigger point injection in the left ankle and advised Plaintiff to return in two weeks. (Tr. 264)

When Plaintiff returned to Dr. Visser on March 25, 2011, her ankle had improved greatly since the last injection, and the swelling was markedly reduced. However, Plaintiff discovered that she was pregnant, so Dr. Visser decided to discontinue further steroid injections. Plaintiff wanted to do another month of physical therapy, after which Dr. Visser planned to release her to return to work. (Tr. 262) On April 22, 2011, Plaintiff was doing well and was ready to return to work. Dr. Visser noted only minimal swelling, with a stable ankle that did not give out at all. (Tr. 261)

Dr. Visser saw Plaintiff on May 31, 2011 for follow-up of left ankle pain. She reported moderate pain and swelling in her left ankle. She believed these problems affected her daily activities. Dr. Visser noted edema in both ankles. He diagnosed ankle sprain and capsulitis, and he prescribed an ankle brace. (Tr. 260)

On July 28, 2011, Kyle DeVore, Ph.D., a non-examining consultative physician, completed a psychiatric review technique form. Dr. DeVore assessed Plaintiff's records from November 10, 201 to present and opined that her medical impairments were not severe. He assessed Plaintiff as having the medically determinable impairment of depressive disorder, not otherwise specified. Dr. DeVore opined that Plaintiff had no restriction of activities of daily

9

living; no difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence, or pace; and no repeated episodes of decompensation. Dr. DeVore noted that Plaintiff did not allege mental health issues, but her medical records indicated a referral for mental health treatment and medications. He further noted that Plaintiff was not taking medication for mental health, and her diagnosis was unclear. However, Dr. DeVore stated that the majority of her issues stemmed from pregnancy, an unstable relationship, numerous STDs, and lack of employment. Further, Dr. DeVore opined that Plaintiff significantly limited herself due to her ankle and was convinced that she had a chronic and severe condition, even though her physical impairment was non-severe. (Tr. 342-53)

On December 11, 2011, Plaintiff presented to the ER for complaints of intermittent headache and blurred vision for the past several weeks after a picture frame fell on her head. She also suffered from itching and swelling, as well as lower back pain since an epidural several weeks ago. Physical exam was unremarkable. Labs revealed an elevated alkaline phosphatase. Plaintiff's head CT was normal. However, a CT of the lumbar spine revealed spinal canal stenosis at L4-L5 secondary to diffuse disc bulge and degenerative changes in the posterior facets; degenerative changes in the L3-L4 facet joints with diffuse disc bulge; and diffuse disc bulging at L5-S1. Dr. John F. Fuller assessed recurrent back pain with diffuse bulging discs in the lumbar spine and post-concussive headaches, as well as mild angioedema of the tongue secondary to allergic reaction. (Tr. 416-19)

Dr. Visser examined Plaintiff on January 10, 2012 for complaints of left ankle pain. Dr. Visser noted STJ tenderness in the left ankle. However, the ankle was very stable and appeared to have a good result from the previous surgery. Dr. Visser assessed capusilitis and administered a steroid injection. (Tr. 380)

10

An MRI of Plaintiff's left ankle performed on January 24, 2012 revealed post-operative changes of the lateral malleolar structures; mild bimalleolar edema; and otherwise negative results. (Tr. 381)

On April 11, 2012, Dr. Kelvin Yamada examined Plaintiff for possible sleep apnea. Dr. Yamada noted a history of obesity, depression, hypertension, and steroid-induced diabetes. Plaintiff did not feel well after the birth of her baby in 2011. Plaintiff felt tired in the morning, and she woke with a headache and periodic gasping and shortness of breath. Plaintiff also experienced a crawling sensation in her legs that required her to move or walk around. Dr. Yamada opined Plaintiff suffered from probable obstructive sleep apnea and restless leg syndrome. (Tr. 601-02) A sleep study performed on April 18, 2012 was abnormal, but PAP titration was not performed at the time. (Tr. 603)

Dr. Alan H. Morris performed a consultative examination on May 9, 2012 at the request of the ALJ. Plaintiff complained of left ankle pain, which she stated began in 2005. Plaintiff reported that surgery did not help, and she continued to have pain and swelling. Her swelling became worse with extended periods of sitting, standing, and walking. Plaintiff used a cane but could ambulate without one. Braces did not help. Plaintiff claimed that Dr. Visser was considering follow up surgery. Upon exam, Plaintiff exhibited some decreased range of motion, flexion, and strength in her left ankle. She could not toe walk but was able to heel walk and do a tandem gait. She had no specific limp. Plaintiff exhibited some generalized tenderness at the lateral aspect of her left ankle. (Tr. 578-80)

Dr. Morris completed a Medical Source Statement, indicating that Plaintiff could lift and carry up to 20 pounds occasionally and 10 pounds frequently; sit for 3 consecutive hours and total in an 8 hour workday; stand at one time for 2 hours and 3 hours total in an 8 hour workday;

11

and walk 1 hour at a time and 2 hours total in an 8 hour workday. She could frequently use both hands to reach, handle, finger, feel, and push/pull. Dr. Morris further opined that Plaintiff could frequently use her right foot but never use her left foot to operate foot controls, and she could only occasionally climb stairs and ramps. Dr. Morris indicated that Plaintiff could never climb ladders or scaffolds, balance, stoop, kneel, crouch, or crawl. Further, she could never be exposed to unprotected heights but was able to occasionally be exposed to moving mechanical parts and operate a motor vehicle. Additionally, Plaintiff was able to shop, travel, ambulate without an assistive device, use public transportation, climb a few steps using a handrail, prepare simple meals, care for her personal hygiene, and sort paper. However, she was unable to walk a block on an uneven surface. (Tr. 581-88)

Also on May 9, 2012, Plaintiff underwent a psychological examination conducted by Summer D. Johnson, Psy.D., at the request of the ALJ. Plaintiff reported depression and anxiety. She complained of ankle pain and stressors in her life, including, family problems, prior abuse, and employment problems. Plaintiff expressed low self-worth, feelings of guilt, overeating, and weight gain. Plaintiff reported previously taking psychotropic medications, but they made her feel like a "zombie." She stopped working in December 2011 due to problems with her ankle and leg, which she considered to be severe. The mental status exam revealed good hygiene, a negative attitude, slowed motor activity, good eye contact and posture, and a gait with a slight waddle. She blamed the doctors for her ankle pain and inability to work. Her mood was depressed, and her affect was tearful at times. She experienced preoccupations and acknowledged some suicidal ideation. Her memory seemed intact, but her judgment, proverb interpretation, and similarities and differences were poor. (Tr. 591-94)

12

With regard to daily functioning, Dr. Johnson noted that Plaintiff cooked, assisted with household chores, and grocery shopped. She fed and dressed her 6 ½ month old child. In addition, Plaintiff drove, went to church, and went out to eat. She reported problems getting along with others. She had no motivation to take care of herself physically. Plaintiff demonstrated fair concentration, good persistence, and moderate pace. Dr. Johnson diagnosed major depressive disorder, recurrent, severe, without psychotic features; PTSD, chronic; hypertension, leg and ankle problems; and a GAF of 50. Her prognosis was guarded with appropriate intervention. Plaintiff was capable of managing funds. (594-95)

Dr. Johnson completed a medical source statement indicating that Plaintiff had mild limitations to her ability to make judgments on simple work-related decisions; understand and remember complex instructions; and make judgments on complex work-related decisions. She was mild to moderately limited in her ability to carry out complex instructions. Dr. Johnson noted Plaintiff was depressed, which interfered with her overall judgment and ability to concentrate. Dr. Johnson opined that Plaintiff's ability to carry out limited physical tasks was fair. The more physical the task, the more difficulty Plaintiff would have. Dr. Johnson noted that she was unqualified to give specifics regarding Plaintiff's physical limitations. (Tr. 596-97)

In a medical source statement (mental) dated May 2, 2013, Dr. Asif Habib opined that Plaintiff had a fair ability to follow work rules, use judgment, and maintain attention and concentration. She had poor to no ability to relate to co-workers, deal with the public, interact appropriately with supervisors, deal with work stresses, and function independently. Further, Dr. Habib stated Plaintiff's ability to understand, remember, and carry out detailed but not complex job instructions and understand, remember, and carry out simple job instructions was poor to none. She possessed a fair ability to understand, remember, and carry out

13

complex job instructions. Her ability to maintain personal appearance was fair, but she exhibited poor to no ability to behave in a socially appropriate manner, relate predictably in social situations, and demonstrate reliability. Plaintiff had difficulty making decisions. These limitations had been present since June of 2011. (Tr. 44-46)

Dr. Visser, Plaintiff's treating orthopedist, issued a medical source statement on May 8, 2013. Dr. Visser opined Plaintiff could work between 1-2 hours per day. She could stand 30 minutes at one time; stand 30 minutes in a workday; sit 60 minutes at one time; sit 30 minutes in a workday; and lift 20 pounds occasionally and frequently. She could seldom bend or stoop; work around dangerous equipment; tolerate heat; tolerate cold; tolerate dust, smoke or fumes exposure; and tolerate noise exposure. Dr. Visser further opined that Plaintiff could occasionally balance; use her hands for fine and gross manipulation; reach with both arms; and operate a motor vehicle. Additionally, Plaintiff had limited close vision. Dr. Visser stated that Plaintiff needed to elevate her feet after 2 hours. She seldom suffered from pain or fatigue. Dr. Visser opined that Plaintiff could not work at all. (Tr. 37). Plaintiff's impairments were present at least since June 2011. Dr. Visser noted Plaintiff had 3 surgeries which failed to rectify her condition and led to the limitations. (Tr. 36-38)

On May 9, 2013, Dr. Ellsworth completed a medical source statement, indicating that Plaintiff had diagnoses of morbid obesity, chronic back pain, and chronic headaches. He opined that Plaintiff could work 4 hours in an 8 hour workday; stand 5 minutes at a time and 30 minutes in a workday; sit 60 minutes at one time and 4 hours in a workday; and lift 5 pounds occasionally and frequently. Plaintiff could seldom bend and stoop. She could occasionally balance; reach with both arms; work around dangerous equipment; operate a motor vehicle; tolerate dust, smoke, fumes; and tolerate noise exposure. She had no limitations in the use of

14

her hands and ability to tolerate temperatures. Dr. Ellsworth opined that Plaintiff needed to elevate her legs during the day. She frequently suffered pain and constantly suffered fatigue. Dr. Ellsworth further opined that Plaintiff would be absent 5 days a month on average. The limitations were present since at least June 2011. Dr. Ellsworth noted these impairments were evidenced by lumbar MRI showing degenerative disc disease with spinal stenosis and mild scoliosis, as well as Plaintiff's BMI. (Tr. 39-41)

Dr. Jonathan Chang evaluated Plaintiff on July 10, 2013. The examination revealed slow gait, paraspinous muscle spasm, tenderness at the lumbosacral region, decreased range of motion of lumbar spine, positive lumbar facet loading bilaterally, and normal range of motion and strength in the lower extremities. Dr. Chang assessed lumbar disc degeneration, lumbar facet syndrome, lumbar spondylosis, and chronic pain. He recommended physical therapy, smoking cessation, and weight loss. (Tr. 32-35) Plaintiff underwent a lumbar medial branch block on that same date. She was discharged to home in stable condition. (Tr. 25-26)

## IV. The ALJ's Determination

In a decision dated November 16, 2012, the ALJ found that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2015. She had not engaged in substantial gainful activity since November 10, 2010, her alleged onset date. The ALJ further found Plaintiff had severe impairments which included residual effects of anterior talofibular ligament in the left ankle, status post-surgical repair; degenerative disc disease of the lumbar spine; obstructive sleep apnea; obesity; major depressive disorder, alternatively diagnosed as depressive disorder, not otherwise specified; and PTSD. However, she did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. The ALJ specifically

15

assessed the medical evidence in light of listings 1.02, major dysfunction of a joint; 1.03, reconstructive surgery or surgical arthrodesis of a major weight-bearing joint; 1.04, disorders of the spine; 3.10, sleep-related breathing disorders; 12.04, affective disorders; and 12.06, anxiety disorders. (Tr. 50-58)

After carefully considering the record, the ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform sedentary work with the additional limitations of occasional stooping and climbing ramps or stairs; no kneeling, crouching, crawling, or climbing ladders, ropes, or scaffolds; and avoidance of concentrated exposure to extreme vibrations and all operational control of moving machinery, working at unprotected heights, and using hazardous machinery. In addition, Plaintiff was limited to performing work that involved only simple, routine, and repetitive tasks in a low-stress job. The ALJ defined a low-stress job as requiring only occasional decision-making, only occasional changes in the work setting, no interaction with the public, and only casual and infrequent contact with coworkers. In making this determination, the ALJ gave Dr. Morris' opinion some weight, and he gave significant weight to the opinion of Dr. Summer Johnson, the psychological consultative examiner. The ALJ gave little weight to Dr. DeVore's opinion, as Dr. DeVore based his opinion on evidence in the record and not on examination or treatment of Plaintiff. Further, the ALJ noted that Dr. DeVore's opinion conflicted with Dr. Johnson. Upon review of the evidence, the ALJ found that the medical evidence did not support the degree of symptomatology and functional limitations alleged by the Plaintiff. The ALJ noted infrequent and conservative treatment, lack of prescription medications, absence of psychological treatment, and inconsistent allegations which undermined her credibility. (Tr. 59-67)

16

The ALJ further determined that Plaintiff was unable to perform any past relevant work. In light of her younger age, high school education, work experience, and RFC, the ALJ found there were a number of jobs existing in significant numbers in the national economy that the Plaintiff could perform. The ALJ relied on the VE's testimony to find that Plaintiff could perform the job of small products assembler. The ALJ noted inconsistencies in the VE's testimony but found a reasonable explanation for the discrepancy. Although the DOT classified that occupation as light exertional work, the number of jobs in the national and local economies provided by the VE reflected jobs performed at the sedentary level. Thus, the ALJ accepted and relied upon the VE's testimony. The ALJ concluded that Plaintiff had not been under a disability from November 10, 2010, through the date of the decision. (Tr. 67-69)

## V. Legal Standards

A claimant for social security disability benefits must demonstrate that he or she suffers from a physical or mental disability. The Social Security Act defines disability "as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a).

To determine whether a claimant is disabled, the Commissioner engages in a five step evaluation process. *See* 20 C.F.R. § 404.1520(a)(4). Those steps require a claimant to show: (1) that claimant is not engaged in substantial gainful activity; (2) that she has a severe physical or mental impairment or combination of impairments which meets the duration requirement; or (3) she has an impairment which meets or exceeds one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1; (4) she is unable to return to her past relevant work; and (5) her impairments prevent her from doing any other work. *Id.*

17

The Court must affirm the decision of the ALJ if it is supported by substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence means less than a preponderance, but sufficient evidence that a reasonable person would find adequate to support the decision." *Hulsey v. Astrue*, 622 F.3d 917, 922 (8th Cir. 2010). "We will not disturb the denial of benefits so long as the ALJ's decision falls within the available zone of choice. An ALJ's decision is not outside the zone of choice simply because we might have reached a different conclusion had we been the initial finder of fact." *Buckner v. Astrue*, 646 F.3d 549, 556 (8th Cir. 2011) (citations and internal quotations omitted). Instead, even if it is possible to draw two different conclusions from the evidence, the Court must affirm the Commissioner's decision if it is supported by substantial evidence. *See Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir.2000).

To determine whether the Commissioner's final decision is supported by substantial evidence, the Court must review the administrative record as a whole and consider: (1) the credibility findings made by the ALJ; (2) the plaintiff's vocational factors; (3) the medical evidence from treating and consulting physicians; (4) the plaintiff's subjective complaints regarding exertional and non-exertional activities and impairments; (5) any corroboration by third parties of the plaintiff's impairments; and (6) the testimony of vocational experts when required which is based upon a proper hypothetical question that sets forth the plaintiff's impairment. *Johnson v. Chater*, 108 F.3d 942, 944 (8th Cir. 1997) (citations and internal quotations omitted).

The ALJ may discount a plaintiff's subjective complaints if they are inconsistent with the evidence as a whole, but the law requires the ALJ to make express credibility determinations and set forth the inconsistencies in the record. *Marciniak v. Shalala*, 49 F.3d 1350, 1354 (8th Cir.

1995). It is not enough that the record contain inconsistencies; the ALJ must specifically demonstrate that she considered all the evidence. *Id.* at 1354.

When a plaintiff claims that the ALJ failed to properly consider subjective complaints, the duty of the court is to ascertain whether the ALJ considered all of the evidence relevant to plaintiff's complaints under the *Polaski*[1] factors and whether the evidence so contradicts plaintiff's subjective complaints that the ALJ could discount the testimony as not credible. *Blakeman v. Astrue*, 509 F.3d 878, 879 (8th Cir. 2007) (citation omitted). If inconsistencies in the record and a lack of supporting medical evidence support the ALJ's decision, the Court will not reverse the decision simply because some evidence may support the opposite conclusion. *Marciniak*, 49 F.3d at 1354.

## VI. Discussion

Plaintiff raises three arguments in her Brief in Support of the Complaint. First, Plaintiff asserts that the ALJ erred in assessing the medical opinions in the record. Second, the Plaintiff contends that the substantial evidence based on the record as a whole does not support the ALJ's RFC determination. Finally, Plaintiff argues that the ALJ erred at Step 5 in finding Plaintiff capable of performing other work available in the national economy. Defendant, on the other hand, asserts that the ALJ properly weighed the medical evidence and properly assessed Plaintiff's RFC. Additionally, Defendant maintains that the ALJ properly determined that Plaintiff was not disabled because she could perform a significant number of jobs. Upon review

---

[1] The Eight Circuit Court of Appeals "has long required an ALJ to consider the following factors when evaluating a claimant's credibility: '(1) the claimant's daily activities; (2) the duration, intensity, and frequency of pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints.'" *Buckner v. Astrue*, 646 F.3d 549, 558 (8th Cir. 2011) (quoting *Moore v. Astrue*, 572 F.3d 520, 524 (8th Cir. 2009)) (citing *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984)).

of the briefs and the record before the Court, the undersigned finds that this case should be remanded to the ALJ for review of the newly submitted evidence.

Plaintiff contends that substantial evidence does not support the ALJ's decision because the Appeals Council should have considered newly submitted evidence, which included medical source statements from Dr. Habib, Dr. Ellsworth, and Plaintiff's treating orthopedist, Dr. Visser. These opinions were submitted after the ALJ's determination but pertain to the relevant time period. "In order to support a remand, new evidence must be 'relevant, and probative of the claimant's condition for the time period for which benefits were denied.'" *Estes v. Barnhart*, 275 F.3d 722, 725 (8ᵗʰ Cir. 2002) (quoting *Jones v. Callahan*, 122 F.3d 1148, 1154 (8ᵗʰ Cir. 1997)). Further, there must be a reasonable likelihood that the evidence would have changed the determination. *Woolf v. Shalala*, 3 F.3d 1210, 1215 (8ᵗʰ Cir. 1993). "Where, as here, the Appeals Council considers new evidence but denies review, we must determine whether the ALJ's decision was supported by substantial evidence on the record as a whole, including the new evidence." *Davidson v. Astrue*, 501 F.3d 987, 990 (8ᵗʰ Cir. 2007) (citations omitted).

The Defendant agrees that this Court should factor in the new evidence but asserts that substantial evidence still supports the ALJ's determination. Specifically, Defendant argues that the three opinions submitted are not material because there is no reasonable likelihood that they would have changed the Secretary's decision.

At the outset, the undersigned notes that the Appeals Council did consider this additional evidence and determined that the information did not provide a basis for changing the ALJ's decision. (Tr. 1-2) However, the reason specified by the Appeals Counsel was that the new information was about a time after November 16, 2012. (Tr. 2) The Plaintiff correctly points out, and the Defendant does not contest, that the physicians' opinions pertained to the relevant

20

time period. Indeed, all three medical source statements state that Plaintiff's limitations had been present since at least June 2011. (Tr. 36-46)

In this case, the ALJ did not have the opportunity to assess or weigh the medical source statements submitted by Drs. Habib, Ellsworth, and Visser. The opinion of Dr. Visser, Plaintiff's treating orthopedist, may be especially relevant and probative to her ability to work during the relevant time period. "'Greater weight is generally given to the opinion of a specialist about medical issues in the area of specialty, than to the opinion of a non-specialist.'" *Brown v.Astrue,* 611 F.3d 941, 953 (8th Cir. 2010) (quoting *Thomas v. Barnhart,* 130 Fed. App'x 62, 64 (8th Cir. 2005)). Although treatment notes reflect improved stability in her left ankle, the notes also indicate continued pain, tenderness, and swelling. (Tr. 260-64, 380) These findings may be consistent with Dr. Visser's opinion that Plaintiff needed to elevate her feet and that she had standing limitations. (Tr. 36-38) The treatment notes indicating complaints of continued pain and swelling are also reflected in Dr. Visser's opinion that 3 surgeries failed to rectify her condition and led to her limitations. (Tr. 38) A medical source statement that is consistent with treatment notes during the relevant time period may relate back to a plaintiff's disability status on the date last insured. *See Tilley v. Astrue,* 580 F.3d 675, 680-81 (8th Cir. 2009) (crediting the treating physician's opinion and medical source statement where they were consistent with treatment notes from the relative time).

The ALJ should have the opportunity in the first instance to determine whether the opinions of Dr. Visser, Dr. Ellsworth, and Dr. Habib are consistent with treatment notes and other medical evidence during the relevant time period, and, if not, explain the inconsistencies in the evidence and the amount of weight entitled to these physicians' opinions. *See Davidson v. Astrue,* 501 F.3d 987, 990 (8th Cir. 2007) (citation omitted) ("When an ALJ discounts a treating

physician's opinion, the Commissioner should give 'good reasons' for doing so."); SSR 96-2p, 1996 WL 374188 (July 2, 1996) ("Controlling weight may not be given to a treating source's medical opinion unless the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques."); 20 C.F.R. § 404.1527(c)(2) (stating the Commissioner "will always give good reasons in [the] notice of determination or decision for the weight [given] your treating source's opinion.").

Because the Court finds that the evidence is new and material, the case should be remanded to the ALJ for review of the medical source statements to determine their relevance to Plaintiff's claim of disability and to further develop the medical record, if necessary. *See Sluka v. Colvin*, No. 4:13CV948 ACL, 2014 WL 4814687, at *14 (E.D. Mo. Sept. 24, 2014) (remanding to the ALJ to consider relevant new evidence, formulate a new RFC, and further develop the evidence, if necessary, where new opinion evidence provided by treating physician did not support the ALJ's RFC determination). "Although the Court is aware that upon remand, the ALJ's decision as to non-disability may not change after properly considering all evidence of record and undergoing the required analysis . . . , the determination is nevertheless one that the Commissioner must make in the first instance." *Cohadarevic v. Colvin*, No. 4:12CV1835 TCM, 2014 WL 1211507, at *13 (E.D. Mo. March 24, 2014) (internal citation omitted).

Accordingly,

**IT IS HEREBY ORDERED** that the final decision of the Commissioner denying social security benefits be **REVERSED and REMANDED** to the Commissioner for further proceedings consistent with this Memorandum and Order. An appropriate Order of Remand shall accompany this Memorandum and Order.

Dated this  5th  day of March, 2015.

RONNIE L. WHITE
UNITED STATES DISTRICT JUDGE